UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARGIE BLEIL,

                              Plaintiff,

        -against-                                    3:15-CV-1492 (LEK/ATB)

CAROLYN W. COLVIN,

                              Defendants.
_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits. Both parties have

filed briefs. Dkt. Nos. 12 ("Plaintiff's Brief"), 15 ("Defendant's Brief"). For the following

reasons, the judgment of the Social Security Administration ("SSA") is vacated and remanded.

## II.     BACKGROUND

        Plaintiff Margie Bleil was born on July 29, 1970. Dkt. No. 9 ("Record") at 472. Bleil

claims that she became disabled on April 1, 2009, as a result of several mental and physical

ailments, including borderline intellectual functioning, depression, anxiety, post-traumatic stress

disorder ("PTSD"), back pain, knee pain, obesity, diabetes, asthma, and a sleep disorder. Pl.'s Br.

at 2, 3, 8–9, 12.

        Bleil lives with her two children, who are seventeen and eight years old. R. at 491. She

has been unemployed since her alleged disability onset date in April 2009. Id. Although Bleil

worked for three hours a day as a certified nursing assistant from February 2010 through July

2010, that work did not rise to the level of substantial gainful activity. Id. at 461.  Bleil reports

being able to do some simple chores around the house, but she must take frequent breaks due to back pain. Id. at 498. Additionally, with the help of her children, Bleil cooks, does laundry, and goes grocery shopping. Id. 498–99. Although Bleil is able to drive or take the bus when needed, she says she has difficulty leaving the house alone and does so only once or twice a month. Id. at 499–500. Bleil has worked part time as a housekeeper for a hotel, at a McDonald's, and as a nursing assistant. Id. at 491–94. But Bleil's only full-time work experience is the nine months she spent as a certified nurse's assistant in 2008 and 2009. Id.

## A. Procedural History

This case began over six years ago, when Bleil applied for disability benefits on September 29, 2010. Id. at 154, 156. Her application was initially denied on December 27, 2010, and Bleil timely requested a hearing to review that determination before an administrative law judge ("ALJ"). Id. at 83, 89. ALJ Marie Greener held a video hearing in which Bleil and her attorney appeared on November 15, 2011, and the ALJ subsequently issued an unfavorable decision. Id. at 8, 32. The ALJ found that Bleil could no longer perform any past relevant work, but that she retained the residual functional capacity ("RFC") to perform unskilled, sedentary work. Id. at 17, 21. Because the ALJ determined that there were jobs existing in significant numbers in the national economy that Bleil could perform, the ALJ found that Bleil was not disabled from April 1, 2009, to January 20, 2012, the date of the decision. Id. at 22.

After the Appeals Council denied Bleil's request for review of the ALJ's decision, id. at 559, Bleil timely commenced an action in the Northern District of New York seeking review of the final agency decision, Complaint, Bleil v. Colvin, No. 13-CV-870 (N.D.N.Y. July 23, 2013). On March 14, 2014, the parties entered into a consent order reversing the agency's final

decision and remanding the case to the Commissioner for further administrative action. <u>Bleil</u>, No. 13-CV-870 (N.D.N.Y. Mar. 14, 2014). On January 15, 2015, the Appeals Council issued a remand order listing several actions the ALJ should take on remand, including obtaining additional evidence concerning Bleil's physical and mental impairments, giving further consideration to Bleil's treating and nontreating source opinions, and obtaining evidence from a vocational expert ("VE").

On July 27, 2015, the ALJ held a hearing at which Bleil and a VE testified. <u>Id.</u> at 487. After the hearing, the ALJ once again issued an unfavorable decision. <u>Id.</u> at 475. The ALJ found that Bleil has the residual functioning to perform unskilled, sedentary work, with some limitations, and that there are significant jobs in the national economy that Bleil can perform. <u>Id.</u> at 457. On December 16, 2015, Bleil brought this action challenging the ALJ's decision. Dkt. No. 1 ("Complaint").

**B. Medical Records**

Although the ALJ ultimately found that Bleil is not disabled, she found that Bleil has the following severe impairments: obesity, chronic lumbar strain, borderline intellectual functioning, and dysthymic disorder. R. at 451. The ALJ also found a number of nonsevere impairments, including hypertension, high cholesterol, diabetes mellitus, obstructive sleep apnea, respiratory disorders, and digestive disorders. <u>Id.</u>

*1. Intellectual Impairments*

Although Bleil graduated from high school, she did not complete all of the usual course work. <u>Id.</u> at 234, 1154. Instead, she was placed in special education classes for reading and math,

and she spent the twelfth grade in an alternative school. Id.[1] Every doctor who has reviewed Bleil's cognitive functioning has found that she is in the low or borderline range. Id. at 329, 341, 548, 1158.

On February 23, 2011, Bleil underwent intelligence testing and a psychological evaluation from consultative examiner Dr. Robert Russell. Id. at 336–42. Dr. Russell found that Bleil's full-scale IQ was a 75, and that she was in the low or borderline range of intellectual functioning. Id. at 341. Her achievement testing was in the low to low average range, with reading skills at a ninth grade level and math skills at a fourth grade level. Id. Dr. Russell opined that Bleil "may find job tasks to be too complicated or difficult to perform consistently," that her pace and accuracy would be poor, and that she would have difficulty exercising good judgment. Id. at 342. Although Dr. Russell declined to make determine whether Bleil would be able to work, he noted that "her low or 'borderline' intellectual function . . . will definitely impede her chances at sustained employment." Id. at 342.

Bleil saw Mary Ann Moore, Psy.D., three times between 2010 and 2015 for consultative evaluations. On December 8, 2010, Bleil saw Dr. Moore for a psychiatric evaluation, and Dr. Moore found that Bleil's intellectual functioning was in the below average range. Id. at 309. Dr. Moore noted that Bleil was capable of counting and simple calculations, and that she had the cognitive abilities to manage her own funds. Id. at 309, 311. But Dr. Moore also recorded that Bleil made errors on serial 3s, and that her attention and concentration were mildly impaired. Id.

---

[1] Bleil reports that she was threatened with suspension in the twelfth grade unless she agreed to take showers at school and bring her clothes into the school to be washed. R. at 338. Instead, Bleil dropped out for a few months, and she was sent to an alternative school when she returned. Id.

At another psychiatric evaluation on September 16, 2013, Dr. Moore once again found that Bleil appeared to be in the borderline range for intellectual functioning, and Bleil made errors on serial 3s. Id. at 921.

On March 12, 2015, Dr. Moore conducted an intelligence evaluation that was generally consistent with the results of Dr. Russell's intelligence testing. Id. at 1154. Bleil received a processing speed index IQ score of 68 and a full-scale IQ score of 71, she exhibited borderline skills in numerical computation ability, and she was found to read at an eighth grade level. Id. at 1156. Dr. Moore noted that Bleil's reading ability was consistent with her overall level of intellectual functioning and was not indicative of a reading disorder. Id. at 1157. Dr. Moore found no limitation in Bleil's ability to follow and understand simple directions, to perform simple tasks independently, or to maintain attention and concentration. Id. But Dr. Moore noted marked limitations in Bleil's ability to learn new tasks and deal with stress, and moderate to marked limitations in her ability to make appropriate work decisions and maintain a regular work schedule. Id. Overall, Dr. Moore opined that Bleil's psychiatric and cognitive issues "may significantly interfere with [her] ability to function on a daily basis." Id. at 1158.

### 2. Psychiatric Impairments

In June 2009, Bleil complained to her primary care physician, Dr. Maria Galu, of anxiety and depression. Id. at 265. Dr. Galu prescribed an antidepressant, which, according to Bleil, was helpful. Id. at 263, 257. After briefly going off her antidepressant medication, she resumed taking it and seems to have been on it ever since. Id. at 337, 1155. At a December 2010 sleep

consultation with Dr. Michael R. Slattery, Bleil was assessed a Beck Depression score of twenty-two, indicating moderate depression. Id. at 347.[2]

In addition to depression, Bleil was diagnosed by multiple doctors and other sources with PTSD stemming from a long history of sexual abuse by her father. In her February 2011 psychological evaluation with Dr. Russell, Bleil reported thinking about her abuse "all day every day," but she denied having nightmares of past abuse. Id. at 337. Dr. Russell found that Bleil "appear[ed] to meet the criteria for posttraumatic stress disorder." Id. at 340. Similarly, during Dr. Moore's March 2015 intelligence evaluation, she diagnosed Bleil with PTSD, and Dr. Moore also diagnosed panic disorder with agoraphobia. Id. at 1158. As a result, Dr. Moore opined that those disorders—in combination with Bleil's borderline intellectual functioning—would interfere with her ability to function on a daily basis. Id.

In addition to meeting with Drs. Moore and Russell, Bleil's records were reviewed by two different state agency medical consultants. First, on December 22, 2010, Dr. R. Nobel conducted a mental RFC assessment and found that Bleil's cognitive ability was below average, which mildly impaired her attention and concentration. Id. at 329. In his summary conclusions, Dr. Nobel also found moderate limitations in Bleil's ability to carry out detailed instructions and to accept criticism from supervisors. Id. at 327–28. In all other categories, however, he determined that Bleil was not significantly limited. Id. Despite Bleil's reports of depression and excessive worry, Dr. Nobel found that her affect was appropriate, her mood was euthymic, and her insight

---

[2] The Beck Depression Inventory is a "widely used 21-item self-report inventory measuring the severity of depression," and scores in the twenty through twenty-eight range indicate moderate depression. Villarreal v. Colvin, No. 13-CV-6253, 2015 WL 6759503, at *8 n.49 (S.D.N.Y. Nov. 5, 2015)

and judgment were fair to good. Id. at 329. Nonetheless, Dr. Nobel diagnosed Bleil with adjustment disorder. Id. at 327.

Second, on September 23, 2013, Dr. T. Harding conducted a mental RFC assessment and found some limitations as a result of Bleil's intellectual functioning deficits and her anxiety-related symptoms. Id. at 540. In particular, Dr. Harding found moderate limitations in Bleil's ability to understand and carry out detailed instructions, to maintain attention and concentration, to interact appropriately with the general public, and to respond appropriately to changes in the work setting, as well as other interaction and adaptation limitations. Id. at 540–41. Dr. Harding indicated that a consultative examination was required, but he ultimately indicated that Bleil could "perform simple, unskilled work from a psychiatric standpoint." Id. at 548.

Bleil also saw two different licensed clinical social workers, Jill Van Pelt and Lois Koston Chojnacki. First, Van Pelt appears to have had multiple appointments with Bleil from August 8, 2011, through October 18, 2011, after which Van Pelt filled out a questionnaire evaluating Bleil's mental limitations. Id. at 374, 431. Van Pelt found that Bleil would have medium limitations in response to stress, her response to changes in the work setting, and her ability to maintain a regular schedule. Id. at 372–73. Van Pelt determined that Bleil's depression and PTSD would cause more than three unexpected absences from any potential job. Id. at 373.

Second, Bleil began seeing Chojnacki for counseling in April 2012. Id. at 1151. Bleil appears to have had weekly sessions with Chojnacki between April 2012 and February 2015. Id. at 1093–1151. On February 19, 2015, after ninety-one sessions with Bleil, Chojnacki filled out a questionnaire evaluating Bleil's mental limitations and found more severe limitations than those identified by Bleil's other sources. Id. at 1090–91. Chojnacki found that Bleil had extreme

limitations in her ability to complete a normal work day and work week without interruptions from her psychological symptoms, and in her ability to respond appropriately to ordinary stressors in a work setting with simple tasks. Id. at 1090. Additionally, Chojnacki noted marked limitations in Bleil's ability to maintain attention and concentration, to accept instructions and respond appropriately to criticism, and to perform activities within a schedule. Id. 1090–91. Finally, Chojnacki determined that Bleil would be absent from work for three or more days a month and would be off task for more than thirty-three percent of the day. Id. at 1091.

### 3. Physical Impairments

The ALJ found that Bleil's obesity and chronic lumbar strain were severe impairments, but Bleil has had many other problems with her physical health. Id. at 451. Bleil has also been diagnosed with asthma, diabetes, hypertension, and sleep apnea, but the ALJ found that those impairments would have no more than a minimal effect on Bleil's ability to perform work. Id. at 451, 1080. Because Bleil's challenge to the physical RFC assessment is based on her obesity and her neck, back, and hip pain—not the other conditions that the ALJ found to be mild impairments—this review of the medical evidence will focus primarily on those issues. Pl.'s Br. at 16–19.

From April 2008 through January 2010, Bleil had a series of appointments with Dr. Maria Galu, her primary care provider at the time. At an April 11, 2008 appointment with Dr. Galu, Bleil complained of weeks of constant low back pain that radiated through her lower extremities. Id. at 270. Bleil returned in November 2008, complaining that her pain was worsening, particularly in her hip. Id. at 267. In November and December 2009, Bleil again saw Dr. Galu and reported continuous lower back pain radiating through her legs; she rated the back pain 10/10

8

in severity. Id. at 258. Dr. Galu ordered an MRI of the lumbar spine, which did not show any abnormalities. Id. at 257.

Between October 11, 2012, and February 12, 2015, Bleil saw a new primary care provider, Dr. James Fleming, along with physician's assistant Susan Anderson and nurse practitioner Kelly Storrs. Id. at 958. Over the course of several visits, Bleil complained of neck, back, and hip pain. Id. at 974, 1002, 1008, 1012. In response, Dr. Fleming ordered an MRI and X-rays of Bleil's neck in November 2013. Id. at 1002, 1069. The testing revealed some neural foraminal narrowing and moderate to severe stenosis of the cervical spine, which corresponded with Bleil's reports of pain. Id. A hip X-ray also revealed soft tissue degenerative changes in Bleil's hips. Id. at 1070. On March 23, 2015, Storrs filled out a questionnaire assessing Bleil's physical limitations. Id. at 1180–81. Storrs found that Bleil would be off task for more than thirty-three percent of a typical workday, that she would be absent for more than four days a month, and that she could sit for approximately two hours during an eight-hour workday and walk or stand for four hours. Id.

Bleil's medical records also contain the results of three physical consultative medical examinations. The first was on December 8, 2010, with Dr. Megad Zaatreh. Id. at 303–06. Bleil complained of constant 10/10 pain in her lower back, which was intensified by any physical activity. Id. at 303. Dr. Zaatreh noted that Bleil was unable to stand on her heels or toes, and her squat was limited to one-third full. Id. at 304. Dr. Zaatreh found some limitations in the flexion of Bleil's lumbar spine, but full range of motion in her hips, knees, and shoulders. Id. at 305. Dr. Zaatreh opined that Bleil was moderately limited for walking, standing, climbing, lifting, squatting, and bending. Id. at 306.

On March 16, 2013, Bleil had a second physical consultative examination, this time with Dr. Justine Magurno. Id. at 913–17. Bleil's chief complaint was back pain and sciatica, and she reported that her pain level was an 8/10. Id. at 913. Dr. Magurno noted limitations in the flexion of Bleil's cervical, thoracic, and lumbar spines. Id. at 916. Dr. Magurno found that Bleil had marked limitations for squatting, lifting, and carrying, and moderate limitations for bending, walking, and standing. Id. at 917.

Bleil's final consultative physical examination took place on March 12, 2015, with Dr. Gilbert Jenouri. Id. at 1077–80. Bleil again reported neck and back pain radiating to her extremities at an intensity level of 8/10. Id. at 1077. Bleil stated the she experienced the pain daily and that it was precipitated by physical activity. Id. Dr. Jenouri noted limitations in the flexion of Bleil's hips and her cervical and lumbar spines, but not in her thoracic spine. Id. at 1079. Dr. Jenouri found that Bleil had moderate restrictions in walking, standing, sitting, bending, stair climbing, lifting, and carrying. Id. at 1080. Dr. Jenouri also found that Bleil would not even occasionally be able to balance, stoop, kneel, crouch, or crawl. Id. at 1086.

## III. LEGAL STANDARD

### A. Standard of Review

When a court reviews a final decision by the SSA, it determines whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S.

389, 401 (1971)). The Court defers to the ALJ's decision if it is supported by substantial

evidence, "even if [the Court] might justifiably have reached a different result upon a de novo

review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20,

2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir.

1984)). The Court should not uphold the ALJ's decision when there is substantial evidence, but it

is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983,

986 (2d Cir. 1987). However, remand is unnecessary "where application of the correct legal

principles to the record could lead to only one conclusion." Id. The Court may not "affirm an

administrative action on grounds different from those considered by the agency." Melville v.

Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citing SEC v. Chenery Corp., 332 U.S. 194 (1947)).

### B.  Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 20 C.F.R. § 404.1505(a). However, an individual seeking disability

benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health &

Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. &

Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in

the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four

steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v.

Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." Id. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe and medically determinable physical or mental impairment—or a combination of impairments that is severe—that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If she does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. pt. 404(P), app. 1. Id. § 404.1520(a)(4)(iii). If it meets one of these listed impairments and durations, the claimant is disabled.

If, following step three, no disability determination has been made, the SSA must determine the claimant's RFC, meaning the most work the claimant is able to do given her impairments and other limitations. Id. §§ 404.1520(e), 404.1545. Then, under step four, the claimant is not disabled if the RFC reveals that the claimant can perform her past relevant work. Id. § 404.1520(a)(4)(iv). If the claimant cannot perform any past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

## IV.    DISCUSSION

Bleil argues that The ALJ's decision should be vacated and remanded for three reasons: (1) the ALJ's mental RFC determination is not supported by substantial evidence, (2) the ALJ's physical RFC determination is not supported by substantial evidence, and (3) the ALJ's step-five determination is not supported by substantial evidence.

### A.  The Mental RFC Assessment

Bleil argues that the ALJ's RFC assessment is not supported by substantial evidence because it fails to account for all of Bleil's mental limitations, including those related to her PTSD. Pl.'s Br. at 13–16. According to Bleil, the ALJ fails to give much weight to any medical opinion, instead substituting her own opinion for those provided by medical sources. Id.

When determining a claimant's residual functioning capacity, an ALJ must consider "all of the relevant medical and other evidence," 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3), particularly medical source opinions, Miller v. Comm'r of Soc. Sec., No. 13-CV-1388, 2015 WL 1383816, at *3 (N.D.N.Y. Mar. 25, 2015). "The ALJ may, in reconciling conflicting evidence, reject portions of a medical opinion and accept other portions of that same opinion." Marrese v. Colvin, No. 15-CV-6369, 2016 WL 5081481, at *3 (W.D.N.Y. Sept. 16, 2016); see also Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). But when an ALJ credits only portions of a medical source opinion, the ALJ must explain why other portions of the opinion were rejected. Raymer v. Colvin, No. 14-CV-6009, 2015 WL 5032669, at *5 (W.D.N.Y. Aug. 25, 2015).

Here, the ALJ determined that Bleil has the mental RFC to perform unskilled work so long as it involves no more than occasional interaction with the public, does not change in person or location on a daily basis, and does not require more than simple decision making. R. at 457. According to the SSA's policy statement, "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4 (1985). In determining that Bleil has the mental RFC to perform such work (with the additional limitations described above), the ALJ did not give significant weight to any of the medical opinions in the record.

The ALJ gave little weight to the opinions of Drs. Russell and Moore, who combined to provide four examining medical consultations, including intelligence testing on Bleil in 2011 and 2015. R. at 468–69. After examining Bleil in 2013, Dr. Moore opined that "[t]he results of the examination appear to be consistent with psychiatric and cognitive issues, which may significantly interfere with the claimant's ability to function on a daily basis." Id. at 922. Dr. Moore came to the same conclusion after performing an intelligence evaluation on Bleil in 2015, and finding that Bleil had a full-scale IQ of 71, borderline skills in her general fund of information, and severe deficits in her visual processing speed. Id. at 1156–57. Similarly, after a 2011 psychological evaluation that included intelligence testing, Dr. Russell opined that it seemed unlikely that Bleil would be able to "secure and sustain gainful employment given her many health concerns and low cognitive functioning." Id. at 342. Neither Dr. Russell nor Dr. Moore's opinion appears to support the ALJ's mental RFC determination, and the ALJ

accorded little weight to their opinions because she found that they were not supported by clinical findings. Id. at 468–69.

As Drs. Moore and Russell both recommended that Bleil seek counseling, Bleil met with two different licensed clincal social workers, Chojnacki and Van Pelt, for counseling sessions. Both Chojnacki and Van Pelt's opinions found mental limitations more significant than those recognized in the ALJ's RFC determination. Id. at 372–74, 1090–91. In particular, Chojnacki—who had weekly counseling appointments with Bleil for over two years—found multiple limitations that would prevent Bleil from performing unskilled work. Id. at 1090–91. Chojnacki noted several marked and extreme limitations in Bleil's concentration and persistence, her interaction with others, and her ability to manage stress. Id. at 1090. She also found that Bleil would be off task for more than thirty-three percent of the work day and would miss three or more days of work a month. Id. at 1091.

The ALJ gave little weight to the opinions of Chojnacki and Van Pelt. Id. at 469, 471. Licensed clinical social workers are not considered acceptable medical sources and their opinions are not to be afforded controlling weight, but "[a] report made by a social worker deserves particular weight where the social worker is the 'sole source that had a regular treatment relationship with plaintiff.'" Hall v. Colvin, No. 15-CV-1189, 2016 WL 6989806, at *7 (N.D.N.Y. Nov. 29, 2016) (Kahn, J.) (quoting White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004)). Here, Chojnacki appears to have been the sole source with a regular treatment relationship with Bleil for a significant period of time, but the ALJ nonetheless gave little weight to Chojnacki's opinion, finding that it was unsupported by clinical evidence. Id. at 469.

Only two medical source opinions were given more than "little weight" by the ALJ when determining Bleil's mental RFC: Harding's and Nobel's, which were accorded "some weight, but not great weight." Id. at 468. The ALJ adopted some of the findings from Dr. Harding's 2013 consultative review of Bleil's medical records but rejected others, including Dr. Harding's opinion that Bleil would be limited to "simple, unskilled work," instead of the full range of unskilled work. Id. at 468, 548. Dr. Nobel's evaluation found some moderate limitations in Bleil's concentration and social interaction. Id. at 323, 327. But, according to the ALJ, Dr. Nobel's findings were consistent with the ability to perform "at least the basic mental demands of unskilled work." Id. at 468. Even if that were true, it would make Dr. Nobel's opinion—which was based on a review of only the medical evidence available through December 2010 and took place before Bleil was evaluated by Drs. Moore and Russell—the only evaluation of Bleil's mental functioning that found Bleil to be capable of the full range of unskilled work. Every other source found greater mental limitations than those accounted for in the ALJ's mental RFC.

"While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony,' [s]he cannot simply selectively choose evidence in the record that supports [her] conclusions." Dioguardi v. Comm'r of Soc. Sec., 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (alterations in original) (quoting Gecevic v. Sec'y of Health & Human Servs., 882 F. Supp 278, 286 (E.D.N.Y. 1995)). An ALJ is entitled to consider the opinions of both examining and nonexamining medical consultants, but "it is well settled that the opinions of examining sources are generally entitled to more weight than those of nonexamining sources." Wilson v. Colvin, No. 14-CV-5666, 2015 WL 5786415, at *28 (S.D.N.Y. Sept. 29, 2015) (citing 20 C.F.R.

§ 404.1527(c)(3)). In this case, however, the ALJ gave "little weight" to every source that actually examined Bleil, and she gave "some weight, but not great weight" to the two nonexamining consultative evaluations.

The lack of supporting medical source opinion alone casts serious doubt on the ALJ's RFC determination. There is, however, an additional issue that leads the Court to conclude that the ALJ's RFC determination is not supported by substantial evidence: the ALJ almost entirely fails to account for Bleil's PTSD diagnosis. Nearly every medical source and other source found that Bleil suffered from PTSD as a result of her long history of sexual abuse. R. at 341, 373, 922, 993, 1158. Despite the uniformity of that diagnosis, Bleil's PTSD is mentioned just once in the ALJ's decision when she includes PTSD in a list of impairments that are "not well-supported by the objective medical evidence." Id. at 451.

In a similar case in this district, Morse v. Commissioner of Social Security, No. 12-CV-1819, 2014 WL 4346456, at *7 (N.D.N.Y. Aug. 29, 2014), the plaintiff was diagnosed by two physicians with PTSD stemming from childhood abuse at the hands of his stepfather. Despite that diagnosis, the ALJ's decision did not mention PTSD or the impact of the plaintiff's childhood abuse. Id. Ultimately, the court in Morse concluded, "[t]he ALJ's failure to consider the effect of plaintiff's PTSD on his symptoms or limitations, or at least to explain why he was not considering the diagnosis of two treating physicians that plaintiff suffered from PTSD, warrants a remand for re-evaluation of all of the medical evidence by the ALJ." Id.; see also Rich v. Comm'r of Soc. Sec., No. 11-CV-85, 2012 WL 209030, at *3–4 (D. Vt. Jan. 24, 2012) (finding that remand was appropriate where the ALJ failed to discuss the plaintiff's PTSD diagnosis in his decision). Similarly, the Court finds that remand is warranted in this case.

**B. The Physical RFC Assessment**

Bleil argues that the ALJ's RFC determination is not supported by substantial evidence because it fails to account for all of her physical limitations, especially her postural limitations. Pl.'s Br. at 16–19. In particular, Bleil objects to the ALJ's finding that "limitations in bending and squatting[,] . . . or any other significant postural limitations noted by the treating sources, are not supported by the objective medical evidence and have not been adopted in this case." R. at 464.

"[I]t is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'" Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (quoting McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)). "[W]hile an ALJ is free . . . to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion or testified before him." Id.; see also Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of a supporting medical opinion has improperly substituted his own opinion for that of a physician . . . .").

Here, the ALJ's determination that Bleil had no limitations in bending or squatting is contrary to the opinions of all three consultative medical examiners who considered the issue. The ALJ gave little weight to the opinion of Dr. Jenouri, who found restrictions in the flexion of Bleil's cervical and lumbar spine, and found that Bleil would not be able to stoop, kneel, crouch, or crawl even occasionally. Id. at 1086. While the ALJ gave great weight to the opinions of Drs. Magurno and Zaatreh, she did not adopt their findings with respect to Bleil's postural limitations.

Id. at 464. Dr. Zaatreh, who examined Bleil in December 2010, found that she was moderately limited for squatting and bending. Id. at 306. And at her September 2013 examination, Dr. Magurno found that Bleil had marked limitations for squatting and moderate limitations for bending. Id. at 917. The ALJ does not cite any medical opinion to support her finding that Bleil has no limitations in bending and squatting and there appears to be no such medical opinion in the record.

"[W]hen a medical opinion stands uncontradicted, '[a] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome' it." Glessing v. Comm'r of Soc. Sec., No. 13-CV-1254, 2014 WL 1599944, at *10 (E.D.N.Y. Apr. 21, 2014) (quoting Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir. 2009)). The ALJ's reasoning was not sufficiently compelling to overcome the medical source opinions. The ALJ relied on various activities that Bleil engaged in during the period of alleged disability, including her ability to get into and out of a car, her ability to climb stairs, and her lack of difficulty with "personal hygiene or grooming, which requires her to perform significant postural demands." R. at 464. The Court is not persuaded that the activities cited by the ALJ—especially her ability to meet the postural demands of personal hygiene and grooming—should override the opinions of Bleil's doctors. See Kane v. Astrue, No. 11-CV-6368, 2012 WL 4510046, at *16 (W.D.N.Y. Sept. 28, 2012) (finding remand was appropriate where "the ALJ did not cite any medical opinion to dispute [the doctor's], instead relying on her own view of [the plaintiff's] ability to perform simple activities of daily living").

The Commissioner argues that—despite the ALJ's explicit rejection of the postural limitations found by Drs. Zaatreh and Magurno—the ALJ's RFC determination is actually

consistent with the opinions of Drs. Zaatreh and Magurno. Pl.'s Br. at 8. This is because the ALJ

limited Bleil to sedentary work, which requires only occasional stooping and no squatting. Id.

Sedentary work is defined as work that

> involves lifting no more than 10 pounds at a time and occasionally
> lifting or carying articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which involves sitting, a
> certain amount of walking and standing is often necessary in carrying
> out job duties. Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567. While an inability to bend more than occasionally would not

"substantially affect an individual's ability to perform . . . sedentary work," McDonaugh v.

Astrue, 672 F. Supp. 2d 542, 571 (S.D.N.Y. 2009) (citing SSR 85–15, 1985 WL 56857, at *2–3

(1985)), a complete inability to stoop would render an individual incapable of unskilled sedentary

work, Molina v. Barnhart, No. 04-CV-3201, 2005 WL 2035959, at *8 (S.D.N.Y. Aug. 17, 2005).

Because remand is necessary for reconsideration of Bleil's mental limitations, the Court

need not determine whether there is substantial evidence that Bleil's limitations in squatting and

bending are compatible with the full range of sedentary work. On remand, however, the ALJ

should consider the impact of those postural limitations on Bleil's RFC.

### C.  The Vocational Expert's Testimony

Bleil's final argument is that the ALJ's step-five determination is not supported by

substantial evidence because it was based on a flawed hypothetical question submitted to the VE.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is

substantial record evidence to support the assumption[s] upon which the vocational expert based

his opinion,' and accurately reflect the limitations and capabilities of the claimant involved."

McIntyre v. Colvin, 758 F. Supp. 146, 151 (2d Cir. 2014) (alteration in original) (citation omitted) (quoting Dumas v. Schweiker, 712 F.2d 1545, 1553–54 (2d Cir. 1983)). "If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." Pardee v. Astrue, 631 F. Supp. 2d 200, 211–12 (N.D.N.Y. 2009).

Here, the ALJ's hypothetical question was based on an RFC assessment that the Court has determined to be unsupported by substantial evidence. Therefore, the CE's response cannot constitute substantial evidence that Bleil is able to work. See Jones v. Colvin, No. 14-CV-6316, 2015 WL 4628972, at *7 (W.D.N.Y. Aug. 3, 2015) ("A VE's response to an inadequate hypothetical cannot constitute 'substantial evidence' to support a conclusion of no disability."). On remand, the ALJ must include all of Bleil's impairments, limitations, and restrictions in any hypothetical presented to a VE.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED and REMANDED** for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     March 31, 2017
              Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge